NO. 04-70017

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**GREGORY LYNN SUMMERS**,
Petitioner-Appellant,

v.

**DOUG DRETKE**, Director,
Texas Department of Criminal Justice,
Institutional Division,
Respondent-Appellee

Appeal from the United States District Court
for the Eastern District of Texas
Beaumont Division, No. 6:07cv139

_____

**BRIEF ON APPEAL IN A DEATH PENALTY CASE**

_____

**Danalynn Recer**
Texas Bar No. 00752935
809 Henderson
Houston, Texas 77007
(713)869-4722
Fax: (713)880-3811

**Clive Stafford Smith**
Louisiana Bar No. 14444
636 Baronne St.
New Orleans, La.  70113
(504) 558-9867
Fax: (504) 558-0378

Counsel for Mr. Summers

NO. 04–70017
_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

**GREGORY LYNN SUMMERS**,
Petitioner-Appellant,
v.
**DOUG DRETKE**, Director,
Texas Department of Criminal Justice,
Institutional Division,
Respondent-Appellee

**CERTIFICATE OF INTERESTED PERSONS**

Undersigned counsel of record hereby certifies that the following persons have an interest in the outcome of this case:

Gregory Lynn Summers, Petitioner-Appellant

Doug Dretke, Respondent-Appellee

Danalynn Recer, Counsel for Mr. Summers

Clive Stafford Smith, Counsel for Mr. Summers

Edward L. Marshall, Counsel for Mr. Dretke


_____
Danalynn Recer
Attorney of Record for Greg Summers

## STATEMENT REGARDING ORAL ARGUMENT

Undersigned counsel hereby requests that the Court grant oral argument in this case. It is a capital habeas corpus appeal in which the issues are sufficiently complex, both factually and legally, that oral argument will likely assist the Court greatly in its consideration and resolution of this matter.

# TABLE OF CONTENTS

Table of Contents ……………………………………………………………… i

Table of Authorities …………………………………………………………… ii

Jurisdictional Statement ……………………………………………………… 1

Statement of the Issues………………………………………………………… 2

Statement of the Case ………………………………………………………… 2

Standard of Review……………………………………………………………… 4

Statement of Facts …………………………………………………………… 5

Claims for Relief ……………………………………………………………… 9

    I.   THIS CONVICTION RESTS SOLELY ON THE UNCONSTITUTIONAL ADMISSION OF AN OUT-OF-COURT STATEMENT BY THE REAL KILLER AND PURPORTED CO-CONSPIRATOR, ANDREW CANTU…………………… 9

    II.    THE STATE WITHHELD EXCULPATORY EVIDENCE, INCLUDING EVIDENCE THAT WOULD VITIATE THE ONLY PURPORTED EVIDENCE AGAINST MR. SUMMERS……………………………………………………16

    III.  THE JURORS WHO SENTENCED MR. SUMMERS TO DIE WERE GIVEN CONSTITUTIONALLY DEFECTIVE INSTRUCTIONS SO CONFUSING AND MISLEADING THAT THEY WERE PREVENTED FROM GIVING EFFECT TO THE MITIGATING EVIDENCE OFFERED BY MR. SUMMERS AND GIVEN NO CHOICE BUT TO VOTE FOR DEATH……………………………………………………24

Conclusion and Prayer for Relief ……………………………………………30

# TABLE OF AUTHORITIES

## Cases

*Adams v. Texas*, 448 U.S. 38(1980), ................................................................28

*Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995), ...................................................5

*Banks v. Dretke*, 124 S.Ct. 1256, 1272 (2004) ..............................................13

*Blystone v. Pennsylvania*, 494 U.S.299 (1990), ............................................28

*Bose corp. v. Consumer Union*, 466 U.S. 485 (1984) ......................................4

*Bourjaily v. U.S.*, 483 U.S 171, 107 S.Ct. 2775 (1987), ...............................13

*Boyd v. Johnson*, 167 F.3d 907, (5th Cir. 1999) ..........................................32

*Brady v. Maryland*, 373 U.S. 83 (1963) ...............................................15, 18

*Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710 (1993) ........................12

*Caldwell v. Mississippi*, 472 U.S. 320 (1985). ............................................27

*California v. Roy*, 519 U.S. 2, 117 S.Ct. 337 (1996) ....................................13

*Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975) .......................................20

*Cantu v. State*, No. 71,314 (Tex. Crim. App. May 25, 1994) ..........................6

*Carter v. Rafferty*, 826 F.2d 1299 (3rd. Cir. 1987) .....................................20

*Chenault v.Stynchcombe*, 581 F.2d 444 (5th Cir. 1978) ..............................27

*Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354 (2004) .........................9

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ..........................................14

*Eddings v. Oklahoma*, 455 U.S. 104 (1982), ..............................................27

*Elder v. Holloway*, 510 U.S. 510.................................................................4

*Elkins v. Smith*, 364 U.S. 206, 80 S. Ct. 1437, (1960) .................................20

*Freeman v. Georgia*, 599 F.2d 65 (5th Cir. 1979)........................................20

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................15, 20, 24

*Godfrey v. Georgia*, 446 U.S. 420 (1980). ..................................................27

*Graham v. Collins*, 113 S.Ct. 892 (1993) ..................................................28

*Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976) ...............................27

*Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003),………………………………… 16

*Johnson v. Texas*, 119 S. Ct. 2658 (1993) ..................................................28

*Jurek v. Texas*, 428 U.S. 262 (1976) .........................................................28

*Kyles v. Whitley,* 514 U.S. 419 (1995) .......................................................24

*Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985) ..........................................24

*Lockett v. Ohio*, 438 U.S. 586 (1978)...........................................27. 28. 32

*Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968) .................................................23

*Massiah v. United States*, 377 U.S. 201 (1964) ..........................................18

*Maynard v. Cartwright*, 486 U.S. 356 (1988); .......................................................27

*Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000) ......................................4

*Penry v. Johnson*, 121 S.Ct. 1910 (2001) ........................................28, 30, 32

*Penry v. Lynaugh*, 492 U.S. 302 (1989)............................................ 27-29

*Pointer v. Texas,* 380 U.S. 400, 405 (1965) ...........................................15

*Profitt v. Florida*, 428 U.S. 242, 253 (1976). .........................................27

*San Miguel v. State*, 864 S.W.2d 493, 495 (Tex. Crim. App. 1993)................................30

*Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263 (2001)........................................27

*Simmons v. South Carolina*, 114 S. Ct. 2187 (1994); ...............................................27

*Skipper v. South Carolina*, 476 U.S. 1 (1986)...........................................28

*Smith v. Fairman*, 862 F.2d 630 (7th Cir. 1988) ...........................................14

*Smith v. Texas*, 125 S.Ct. 400 (2004) .........................................28, 30, 32

*Spivey v. Zant*, 661 F.2d 464 (1981)...........................................29

*Strickland v. Washington*, 466 U.S. 668 (1984) ...........................................4

*Tennard v. Dretke*, 124 S.Ct. 2562 (2004) ...........................................28

*U.S. v. Fragoso*, 978 F.2d 896 (5th Cir. 1992) ...........................................12

*United States v. Agurs*, 427 U.S. 97 (1976)...........................................13, 24

*United States v. Alexius*, 76 F.3d 642 (5th Cir. 1996) ...........................................23

*United States v. Auten*, 632 F.2d 478 (5th Cir. 1980)...........................................21

*United States v. Bagley,* 473 U.S. 667 (1985) ...........................................24

*United States v. Bourjaily*, 483 U.S. 171 (1987) ...........................................10

*United States v. Brown*, 546 F.2d 166 (5th Cir. 1977) ...........................................23

*United States v. Byrom*, 910 F.2d 725 (11th Cir. 1990) ...........................................12

*United States v. Clark*, 18 F.3d 1337 (6th Cir. 1994) ...........................................12

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) ...........................................12

*United States v. Deutsch*, 475 F.2d 55 (5th Cir. 1973)...........................................20

*United States v. Gambino*, 926 F.2d 1355, (3rd Cir. 1991) ...........................................12

*United States v. Garbett*, 867 F.2d 1132 (8th Cir. 1989)...........................................12

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) ...........................................12

*United States v. Hendricks*, 661 F.2d 38 (5th Cir. 1981) ...........................................20

*United States v. Henry* 447 U.S. 264 (1980) ...........................................18

*United States v. James*, 590 U.S. 575 (5th Cir. 1979). ...........................................10

*United States v. Landerman*, 109 F.3d 1053 (5th Cir. 1997) ...........................................23

*United States v. Martinez*, 825 F.2d 1451 (10th Cir. 1987) ...........................................12

*United States v. Rodriguez*, 799 F.2d 649 (11th Cir. 1986) ...........................................20

*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993)...........................................12

*United States v. Silverman,* 861 F.2d 571 (9th Cir. 1988) ................................12

*United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988); ...........................12

*Wiggins v. Smith*, 123 S.Ct. 2527 (2003) ...............................................24, 26

*Williams v. Taylor*, 529 U.S. 362 (2000) .....................................................24

*Woodson v. South Carolina*, 428 U.S. 280 (1976), .......................................28

*Zappulla v. People of State of N.Y.,* No. 03-2793, 2004 WL 2601682 (2nd Cir. Nov. 17, 2004)

........................................................................................................13

## Statutes

Art. 37071(2)(e)(3)(d), V.A.C.C.P ...............................................................29

28 U.S.C. §§ 2253(c) ..................................................................................1

28 U.S.C. Section 2254 ........................................................................ passim

 T.C.C.P. Art. 11.071, § 8(a) ....................................................................17

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **GREGORY LYNN SUMMERS** | § |
| **Petitioner-Appellant,** | § |
| | § |
| **–v–** | § |
| | § |
| **DOUG DRETKE, Director, Texas** | § |
| **Department of Criminal Justice,** | § |
| **Institutional Division,** | § |
| **Respondent-Appellee.** | § |

_____

### BRIEF ON APPEAL IN A DEATH PENALTY CASE

GREGORY LYNN SUMMERS, petitions this court for relief from an unlawful incarceration pursuant to a judgment of conviction for capital murder and sentence of death imposed on August 23, 1991 by the 16th Judicial District Court of Denton County, Texas.

### JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. §§ 2253(c) and 2254. The District Court issued final judgment denying Mr. Summers' Application on March 24, 2004. Mr. Summers filed a Notice of Appeal on April 23, 2004 and the District Court granted Certificate of Appealability on three of the ten issues raised below. This Court ordered briefing on those issues, to be filed on November 8, 2004 and heard simultaneously with Mr. Summers' Application for Additional Certification of Appealability. That deadline was extended until December 8, 2004, and Mr. Summers now timely files this brief on Appeal.

### STATEMENT OF THE ISSUES

This case presents the Court with three issues for review:

1. Whether Mr. Summers has demonstrated, or is entitled to a hearing in District Court so that he may demonstrate, that the state trial court's finding that the out-of-court statement of

Andrew Cantu could be admitted before the jury through Flores and Gonzales although no conspiracy had been established between Mr. Summers and Cantu was an unreasonable application of clearly established Federal law or based on an unreasonable determination of the facts.

2. Whether Mr. Summers has demonstrated, or is entitled to a hearing in District Court so that he may demonstrate, that the state trial court's finding that he was not denied his right to the due process of law by the State's failure to disclose exculpatory evidence was an unreasonable application of clearly established Federal law or based on an unreasonable determination of the facts.

3. Whether Mr. Summers has demonstrated, or is entitled to a hearing in District Court so that he may demonstrate, that the state trial court's finding that his Eighth Amendment right to individualized sentencing was not violated by the trial court's constitutionally infirm instruction was an unreasonable application of clearly established Federal law or based on an unreasonable determination of the facts.

STATEMENT OF THE CASE

## 1. Prior Proceedings

Gregory Lynn Summers was convicted and sentenced to die in 1991 in the 16th Judicial District Court of Denton County, Texas, on a change of venue from Taylor County. His conviction has been affirmed on appeal,[1] and his state post-conviction application has been denied, though without even a pretense of judicial process.[2] The State Court findings of fact

---

1 *Summers v State*, Nos. 71,338 & 71,389 (Tex. Crim. App. June 8, 1994), *cert denied*, 117 S.Ct. 89 (Mem) (1996).

2 On October 1, 1997, Mr. Summers filed an Application for Writ of Habeas Corpus with the District Court in Taylor County. The State responded on October 31, 1997. Twelve days later, without any factual development whatsoever, the trial court found that no contested issues of fact existed. Mr. Summers filed a Motion for Reconsideration of the Order, an Objection to the Denial of Applicant's Request for a Full and Fair Hearing, and Proposed Findings of Fact and Conclusions of Law. October 11, 1999, the trial court sent Mr. Summers' case to the CCA with a recommendation that the writ be denied. Although both the state and defense filed Proposed Findings of Fact and Conclusions of Law, the court did not enter any such findings or conclusions at the time. On February 12, 2001, the CCA Ordered Judge

were a verbatim copy of the prosecutor's proposed findings and conclusions, filed without a hearing, discovery, or other factual development, just ten days after the CCA ordered that findings be issued. In such a short time, it is virtually inconceivable that the trial court conducted any independent inquiry into the facts alleged by Mr. Summers, or even fact-checked the State's proposed Findings, particularly given that the transcript and Statement of Facts had been forwarded to the Court of Criminal Appeals four years previously. Numerous factual errors were contained in the findings, as noted by Mr. Summers in his original federal habeas petition. Indeed, Judge Holloway apparently thought his job was done once he ordered the parties to prepare Findings of Fact and Conclusions of Law, and he never considered actually reading them:

> On November 12, 1997, the Court entered its Order finding that no unresolved factual issues material to the legality of Applicant's confinement exist and order [sic] the parties to file proposed findings of act [sic] and conclusions of law within thirty (30) days and the Court assumed that such Order was forwarded to the Court of Appeals along with the Application for Writ.

Findings of Fact and Conclusions of Law, (Record Excerpt 7).

Nor is their any indication that anyone at the CCA gave meaningful consideration to Mr. Summers' pleadings.[3] The Court's copies of the petition were delivered to the Court on March 12, 2001, and denied in a two page, unpublished *per curiam* Order without assigned reasons on March 26, 2001,[4] suggesting that no one bothered to read them.

Neither the Trial Court Findings of Fact and Conclusions of Law nor the CCA's Order mention any law — state or federal — other than a single reference to *Penry v. Lynaugh* by the trial

---

Holloway to file written Findings of Fact and conclusions of Law within 30 days. On February 22, 2001, Judge Holloway filed a verbatim copy of the prosecutor's proposed findings and conclusions, styled as findings of the Court. On March 29, 2001 the CCA denied Mr. Summers' application.

3 Evidently, the trial court failed to forward Mr. Summers' petition to the CCA (though the record had been delivered in October 1999), as a clerk contacted defense counsel for copies of the petition.

4 Although the Order is dated the 28th of March, the Order was mailed to counsel on the 26th of March. Thus, the court could not have considered the petition after that date.

court.

## 2. Disposition Below

Recognizing the lack of process in State court, the District Court for the Eastern District of Texas, rejected the State Court findings in six instances and found that the State Court had failed to decide the issue in six other instances. Unfortunately, however, rather than provide Mr. Summers with the process that has been so far denied, the District Court issued a lengthy Memorandum Opinion purporting to resolve contested issues of fact and law without a hearing, as support for his March 4, 2002 Order granting Respondent's motion for summary judgment on all claims. (Record Excerpt 5) Mr. Summers filed a Motion pursuant to Rule 59(e), pointing out that the State had never moved for Summary Judgment and that the District Court had repeatedly applied the standard for granting relief under 28 U.S.C. §2254 to support its conclusion that Summary Judgment should be granted. This motion was partially granted and partially denied on March 24, 2004 when the Court issued an Amended Judgment, with a Memorandum Opinion and Order explaining that the Judgment was Amended to correct the error regarding whether or not the State had sought summary judgment and to "state its conclusions without using [the summary judgment] standard." *See* Record Excerpt 6. Mr. Summers then filed a Notice of Appeal on April 23, 2004 and the District Court Issued a Certificate of Appealability as to three issues on May 10, 2004.

## STANDARD OF REVIEW

District Court rulings on questions of law and "mixed" questions of law and fact are presented to this Court for *de novo* review.[5] Because the District Court rejected the State Court findings of fact and replaced them with a Memorandum Opinion premised upon the wrong legal standard, this Court should also engage in a *de novo* review of the fact findings of the court below.[6]

---

5 *Elder v. Holloway*, 510 U.S. 510, 516 (1994); *Strickland v. Washington*, 466 U.S. 668, 686, 698 (1984); *Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000).
6 *Bose Corp. v. Consumer Union*, 466 U.S. 485, 501 (1984) ("Historical facts 'found' in the perspective framed

The standard for granting relief from a State court judgment under 28 U.S.C. §2254(d) is whether the state court decision was "contrary to, or involved an unreasonable application of clearly established Federal law" or "was based on an unreasonable determination of the facts".

A federal habeas petitioner is entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(1) "when (1) there is a factual dispute which, if resolved in the petitioner's favor, would entitle the petitioner to relief, and (2) the petitioner did not receive a full and fair evidentiary hearing in state court." *Amos v. Scott*, 61 F.3d 333, 346 (5th Cir. 1995), cert. denied 116 S.Ct. 557, 516 U.S. 1005, 133 L.Ed.2d 458.

Because the District Court already rejected the State Court fact findings in all of the claims upon which COA was granted, with the exception only of one subpart of one claim, the District Court has already found that Mr. Summers did not receive a full and fair hearing in state court. The District Court did not engage in any fact finding process, and thus did not have sufficient facts to enter his own ruling. The District Court's Opinion does, however, make it clear that additional fact-finding is necessary, as the Court discusses factual disputes and identifying missing information in virtually every claim. This Court should, then, send Mr. Summers back to the District Court for further factual development of these claims.

## STATEMENT OF FACTS

On June 11, 1990, Andrew Cantu, Paul Flores and Raymond Gonzales crawled in the window of Greg Summers' childhood home, stabbed to death Mr. Summers' father, Mandell Eugene Summers, mother, Helen Summers, and uncle, Billy Mack Summers,[7] fruitlessly ransacked the house for valuables, and then set it ablaze as they fled.[8]

Acting on a tip from Andrew Cantu's brother, Joe Cantu,[9] the police soon arrested all

---

by an erroneous legal standard cannot plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them.").

7  Statement of Facts, Vol. XII, pp. 189-194.  Hereinafter, "S.F. [volume number] at [page number]." Citations to the Transcript will follow the form "Tr.[volume number] at [page number]."

8  S.F. XIV at 895, 906, 914; S.F. XII at 223.

9  S.F. XIII at 561-562.

three perpetrators. In the coming weeks, the highly publicized case generated much gossip and many rumors. Predictably, several entrepreneurial souls brought their dubious nuggets to Crimestoppers in hopes of reward. As a result, Mr. Summers was arrested. From that day to this, Mr. Summers has grieved the loss of his family and steadfastly denied any involvement in their deaths.

It is undisputed by the parties that Mr. Summers did not kill his family and was not present during the killings.[10] It is also undisputed that all three victims were killed by Andrew Cantu, who has since been executed for his crime.[11] Indeed, the only dispute in the case is whether Mr. Summers conspired with Cantu. It is the state's allegation that Mr. Summers hired Cantu to kill his family and that Cantu then brought two accomplices with him on the night of the murders. However, the only evidence supporting this theory is the unsworn, out-of-court statements purportedly made by the killer himself–Andrew Cantu–to his two confederates– Paul Flores and Raymond Gonzales. The Cantu and Summers families knew one another, but neither Flores nor Gonzales ever met Greg Summers or even knew his name. They alleged, during the testimony which earned them great favor with the sentencing court, that Cantu told them he had been hired by the son of the murder victims. Cantu never testified and never made a sworn statement regarding any allegations against Mr. Summers.

No physical evidence links Greg Summers to the crimes for which he has been condemned. The case against him was based upon unsupported circumstantial evidence and testimony from inmate and accomplice witnesses, each of whom had a vested interest in the conviction of Greg Summers.

There are no allegations that Mr. Summers ever paid Andrew Cantu. There was no evidence whatsoever that Mr. Summers ever spoke to Cantu concerning the murder of his parents. The State offered no independent evidence of conspiracy between Mr. Summers and

---

10 S.F. XII at 34-59.
11 *Cantu v State*, No. 71,314 (Tex. Crim. App. May 25, 1994)

Cantu, relying only on some evidence that he had visited Cantu's home the day before the crime.

On June 15, 1990, drug trafficker Keenan Wilcox contacted the Abilene Police Department with a story that Mr. Summers approached him in 1989 and asked Wilcox to kill his family and burn their house down. Wilcox indicated that he refused to participate with Mr. Summers, and never notified the police. According to Wilcox, Mr. Summers offered to pay him from insurance money and cash and property in the house.[12]

However, what Wilcox did not disclose to the jury was that he came forward with the alleged statements of Mr. Summers not simply to be a "good citizen" but because he hoped to obtain a reward from Crimestoppers for the information. Wilcox now admits that he was known to the police as a drug trafficker at the time of his testimony, and that he was willing to fabricate evidence to get the reward money in order to purchase controlled substances.

Detective Berry recruited an inmate at the jail to attempt to elicit a confession from Mr. Summers. William Spaulding, an inmate who had befriended Mr. Summers in the county jail was coerced into testifying for the State by threats of prosecution. *See* Record Excerpt 8.

Spaulding testified that Mr. Summers had confessed to participating in the murder of his father.[13] However, Spaulding testified only to a portion of his purported conversation with Mr. Summers. Spaulding was told to relate only incriminating statements allegedly made by Mr. Summers, and did not reveal through his testimony that immediately after "admitting" that he was involved in the killing of his father, Mr. Summers supposedly recanted and again completely denied any involvement in the killings. *See* Record Excerpt 8, Affidavit of William Spaulding.

Based upon this scant circumstantial case, and the testimony of two accomplices whose testimony is supported only by testimony now known to be tainted, the jury found Mr. Summers guilty of two counts of capital murder.

---

[12]  S.F. XV at 1001; S.F. XV at 1027-1028.
[13]  S.F. XII at 235

D.    *The Penalty Phase of Trial.*

Mr. Summers was absent throughout the entire penalty phase of his trial.[14]   In his absence, the State presented the tainted testimony of the now discredited Dr. James Grigson who concluded, without ever examining him, that Mr. Summers posed a future danger to society.[15]   This testimony was the foundation of the State's penalty phase case, which included the now-discredited testimony of Darrell Shirlls, See infra.   The defense presented mitigating evidence to the effect that Mr. Summers was a sincere Christian who held down a job and supported his girlfriend and her children and that he would adapt well to the structured environment of prison.   However, the jury was given an instruction that denied them any opportunity to give effect to this mitigation evidence and they returned a verdict requiring that a sentence of death be imposed.

## CLAIMS FOR RELIEF

## I.  THIS CONVICTION RESTS SOLELY ON THE UNCONSTITUTIONAL ADMISSION OF AN OUT-OF-COURT STATEMENT BY THE REAL KILLER AND PURPORTED CO-CONSPIRATOR, ANDREW CANTU

The right to confront one's accusers, and, specifically, the right to test the evidence against oneself through the "crucible of cross-examination," is an essential component to a fair trial.   *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1367 (2004) (The cross-examination "requirement [i]s dispositive, and not merely one of several ways to establish reliability.")   Although the practice is increasingly disfavored, there remain some narrow instances in which hearsay evidence might be admitted once an independent judicial determination has found sufficient indices of reliability.   *Ohio v. Roberts.* 448 U.S. 56 (1980).   As discussed at length by the *Crawford* court, the admission of such evidence brings with it an extraordinarily high risk and the process of testing its reliability must be taken seriously.

Unfortunately,  when  the  prosecution  offered  testimony  by  Flores  and  Gonzales

---

[14]  S.F. XVII at 3-7
[15]  S.F. XVII at 97.

regarding an out-of-court statement purportedly made by Cantu, the trial court refused to allow any process – rigorous or not – to consider the reliability of this highly suspect evidence. Mr. Summers objected and asked the trial court to hold a hearing to first determine whether a conspiracy existed between Mr. Summers and Cantu.[16] The trial court refused and allowed the State to offer the statements of Cantu as "non-hearsay" pursuant to Texas Rule of Criminal Evidence 801(e)(2)(E).[17]

### A. No Showing of Conspiracy Between Mr. Summers and Cantu Was Made

The admission of an out-of-court statement by a codefendant is governed by Texas Rule of Criminal Evidence 801.[18] The "requirements for admission under [Rule 801] are identical to the requirements of the Confrontation Clause." *United States v. Bourjaily*, 483 U.S. 171, 182 (1987). Thus, in order to ascertain whether a constitutional violation has occurred, a court must determine whether Cantu's statements were properly admitted as non-hearsay pursuant to Rule 801. As the court explained in *Bourjaily*:

> Before admitting a co-conspirator's statement over an objection that it does not qualify under [Rule 801], a court must be satisfied that the statement actually falls within the definition of the Rule. There must be evidence that there was a conspiracy involving the declarant and the non-offering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'

*Bourjaily,* 483 U.S. at 175. Due process requires the court to make an independent evaluation of the existence of a conspiracy involving the defendant on trial before admitting co-conspirator statements. *United States v. James*, 590 U.S. 575 (5th Cir. 1979). In *James*, this Court held:

> a declaration by one defendant is admissible against other defendants only where there is a 'sufficient showing, by independent evidence of a conspiracy' . . . and

---

[16] In the Fifth Circuit and in Texas, this hearing is known as a *James* hearing. *United States v. James*, 590 F.2d 575 (5th Cir. 1979), *cert. denied*, 442 U.S. 917 (1979).

[17] Texas Rule of Criminal Evidence 801(e)(2)(E) states: "A statement is not hearsay if: the statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

[18] This rule is identical to Fed. R. Evid. 801.

that . . . there must be *substantial independent* evidence of a conspiracy at least enough to take the question to the jury.

*James*, 590 U.S. at 581 (emphasis in original, internal citations omitted, quoting *U.S. v. Nixon*, 418 U.S. 683 (1974)). This requirement is particularly urgent where it is the question of the existence of a conspiracy itself which is at issue, and yet it was completely ignored by the trial court in Mr. Summers' case. Instead, the trial court overruled defense counsel's objection, by holding that the simple fact of Cantu's conviction established the conspiracy. The trial court did not cite to any facts or findings of the Cantu court, and no evidence was entered into the record to indicate whether, in fact, the evidence produced at Cantu's trial did demonstrate that he had conspired with Mr. Summers. Mr. Summers was given no opportunity to present arguments or evidence that no conspiracy existed. Since Mr. Summers was not, and could not have been, represented in the earlier proceedings, traditional notions of collateral estoppel or issue preclusion do not apply.[19] The trial court's failure to make an independent analysis of whether there was "substantial independent evidence" of a conspiracy between Cantu and Mr. Summers before allowing Cantu's statements to be admitted amounts to constitutional error and Mr. Summers should be given a hearing in the federal District Court.

### A Court Cannot Rely Solely Upon an Alleged Co-conspirator's Statements to Determine that a Conspiracy has been Established.

Although the trial court made no inquiry as to whether a conspiracy existed before admitting statements by Cantu against Mr. Summers, if it had done such an inquiry, its decision could only have rested on the hearsay statements alone. The Supreme Court has never held, and indeed has resisted the notion, that a trial court may rely "solely" on the co-conspirator's statement itself to determine that a conspiracy had been established by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 181. In discussing the required reliability for evidence to

---

[19] *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783 (1984)("[I]ssue preclusion 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated *between the same parties* in any future lawsuit.'" (emphasis added)).

satisfy the Confrontation Clause, the Supreme Court noted that *Glasser* required proof "*aliunde*" of a conspiracy -- evidence from another source -- together with the hearsay statement in order to admit the hearsay statement. *Bourjaily*, 483 U.S. at 177. Requiring proof *aliunde* is consistent with the plain language of Fed. Rule Evid. 104(a). *Bourjaily*, 483 U.S. at 185 (concurring opinion of Justice Stevens). Thus, a hearsay statement may only lift itself into admissibility by tugging on its own bootstraps if there exists independent support for the existence of the conspiracy.

As the District Court acknowledged, while neither the Fifth Circuit nor the Supreme Court have addressed the issue, every Federal Circuit Court which has interpreted *Bourjaily* has consistently held that absent *some* independent, corroborating evidence of the defendant's knowledge and participation in the conspiracy, the out-of-court statements remain inadmissible. Order at n. 7.[20]

### The independent evidence presented by the state must be enough to rebut a hearsay declaration's presumption of unreliability before the words of a mere accomplice can be admitted as a coconspirator statement.

"When preliminary facts to admissibility of coconspirator testimony under Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence." *U.S. v. Fragoso*, 978 F.2d 896, 900 (5th Cir. 1992) (citations omitted). Because the declarant often has an interest in leading the listener into believing a "conspiracy" is stronger, has more members and other aims than it actually does, and that such statements are often "idle

---

[20] See *United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993); *United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir. 1988); *United States v.*); *United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir. 1988); *United States v. Gambino*, 926 F.2d 1355, 1361 n. 5 (3rd Cir. 1991), *cert. denied*, 502 U.S. 956 (1991); *United States v. Clark*, 18 F.3d 1337, 1341-1342 (6th Cir. 1994);); *United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988); *United States v. Garbett*, 867 F.2d 1132, 1134 (8th Cir. 1989) ["an otherwise inadmissible hearsay statement cannot provide the sole evidentiary support for its own admissibility"]; *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988);); *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987);); *United States v. Byrom*, 910 F.2d 725, 736 (11th Cir. 1990).).

chatter," or even "malicious gossip," additional evidence rebutting the presumption of unreliability is vital. *United States v. Silverman,* 861 F.2d 571, 578 (9th Cir. 1988).

## Court Below

The District Court properly determined that because the state court failed to analyze these claims under federal law, they would be subject to *de novo* review in federal court under 28 U.S.C. § 2254. However, the Court then erroneously applies the *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710 (1993), harm standards ("whether error had substantial and injurious effect or influence in determining jury's verdict.") *Id.* at 623, in conducting that review. Where, as the District Court found here, the state court fails to review a properly raised federal constitutional claim, it is the *Chapman* standard, not the *Brecht* standard that District Courts must apply. *Id.* at 636.[21] For the same reasons that the Court found it must hear the claim *de novo*, it must also apply the *Chapman* standard.

The district court further recognized the trial court's failure to make factual findings as to whether a conspiracy between Mr. Summers and Cantu existed, and therefore should have held a hearing pursuant to § 2254(e).

Although the District Court recognized that out-of-court statements regarding conspiracies are inherently unreliable, citing *Bourjaily v. U.S.*, 483 U.S 171, 180, 107 S.Ct. 2775 (1987), it nevertheless found sufficient evidence of a conspiracy by looking to equally unreliable evidence, namely that of a jailhouse informant, William Spaulding, as its sole basis for finding "sufficient independent evidence" of a conspiracy. Such a tenuous rationale for establishing a statement's reliability is the precise evil which the Supreme Court in *Crawford* sought to avoid. See *Crawford* at 1371. The testimony of jailhouse snitches is perhaps the most

---

[21] *See also United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (applying *Chapman* standard to prosecutorial misconduct claim, where defendant not at fault for state court's failure to review the claim in prior litigation); *California v. Roy*, 519 U.S. 2, 5, 117 S.Ct. 337, 338 (1996) (application of *Brecht* standard in federal habeas proceedings presupposes that state court has applied *Chapman* standard on issues raised on direct appeal).

unreliable species of evidence admitted in criminal trials, particularly where, as here, there is evidence that Spaulding was acting at the behest of the State[22] when he allegedly heard the inculpatory statement by Mr. Summers.[23] In addition to the problems with Spaulding's testimony discussed above, Spaulding also had a prison disciplinary conviction for giving false testimony at the time of trial, unbeknownst to defense counsel.[24] Nevertheless the District Court deemed Spaulding's discredited statement to be sufficient "independent" evidence of conspiracy, without holding a hearing.

### B.  Mr. Summers' Right to Confrontation Under the Sixth Amendment was Violated when the Trial Court Prohibited Counsel from Attacking the Credibility of Hearsay Declarant Andrew Cantu

The violation of Mr. Summers' Confrontation Clause right "to be confronted with the witnesses against him," *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986), was exacerbated by the trial court's refusal to allow him to impeach the credibility of the hearsay declarant, Andrew Cantu.[25] The evidentiary rule, codified in Texas Rules of Criminal Evidence Rule 806, specifically authorizes this type of impeachment and flows directly from the Supreme Court's edicts in *Delaware v. Van Arsdall, supra*, and *Davis v. Alaska, supra*.

During Mr. Summers' trial, four state's witnesses were allowed to introduce statements of alleged co-conspirator Andrew Cantu which incriminated Mr. Summers.[26] On cross-

---

22 Petitioner continues to assert that Spaulding's cooperation with the State violated Massiah and has petitioned this Court to hear this claim in a separately filed Application for an Additional COA.

23  *See Banks v. Dretke*, 124 S.Ct. 1256, 1272 (2004);); *Zappulla v. People of State of N.Y.,* No. 03-2793, 2004 WL 2601682 (2nd Cir. Nov. 17, 2004). ).

24 The District Court's discussion of Spaulding's veracity refers to Mr. Summers' claims that Spaulding's testimony was inadmissible. Order at 10-13. While the District Court's deference to the State court's determinations was appropriate in reviewing that claim, assuming that the State court did indeed deny the claim on the merits, such deference was improper in the context of the Confrontation clause issue.

25  *See e.g. Smith v. Fairman*, 862 F.2d 630 (7th Cir. 1988) (finding trial court's refusal to allow petitioner to impeach statements of a hearsay declarant analogous to limitation of attempt to cross-examine witness).

26  S.F. XII, at 30-31, 34-35, 36, 38, 51, 58-59 and 60-61 (testimony of Paul Flores); S.F. XIII at 381-382, 384-385 and 389-393 (testimony of Joe Cantu); S.F. XIV at 813-821 and 826-827 (testimony of Raymond Gonzales); S.F. XV at 948-949, 952, 953, 960-962 and 963-964 (testimony of Max Aguirre).

examination of State's witness William Spaulding, Mr. Summers' counsel attempted to attack Andrew Cantu's credibility by inquiring about a conversation between Spaulding and Cantu. The State objected and the trial court sustained the objection.[27]

Spaulding was recalled by the State later in the trial. At that time, Mr. Summers' counsel was allowed to make a proffer of the excluded testimony. During the proffer, Spaulding admitted having a conversation with Cantu on December 19, 1990, during which Cantu told him that there was a "contract out on" Mr. Summers, and that it had been raised from one thousand to five thousand dollars.[28]

Although the importance of these statements in assessing other statements also attributed to Cantu cannot be understated, the trial court never allowed the jury to hear this testimony. The District Court speculated that the trial court's refusal to allow the testimony was harmless, because the jury might have concluded that the contract on Mr. Summer's life resulted from his alleged failure to "pay up" on the murder contract. However, this is mere speculation. The fact that the District Court resorts to such speculative reasoning is further evidence that the issues cannot be resolved without a hearing. Deprived of the ability to attack Cantu's hearsay statements, Mr. Summers was essentially foreclosed from exposing the obvious bias and motivation of one of the State's key witnesses. Due to the trial court's rulings, Cantu was in effect, allowed to "testify" at Mr. Summers' trial without being subject to any cross-examination.

Mr. Summers was denied the right to effectively cross-examine Cantu and was therefore denied "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas,* 380 U.S. 400, 405 (1965).

## II. THE STATE WITHHELD EXCULPATORY EVIDENCE,

---

[27] S.F. XII at 238, 240-241.
[28] S.F. XIII at 440, 450-452. This testimony was corroborated by another witness, Doug Jones, who related he had previously told Mr. Summers' counsel that Andrew Cantu told him he would have killed Mr. Summers too if he had been in the house. S.F. XV at 1255.

**INCLUDING EVIDENCE THAT WOULD VITIATE THE ONLY
PURPORTED EVIDENCE AGAINST MR. SUMMERS**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that the prosecution's suppression of evidence favorable to a defendant violates due process where the evidence is material either to guilt or to punishment. The Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis. *Bagley*, at 677; *Giglio v. United States*, 405 U.S. 150, 154 (1972).

As set forth below, the State failed to provide numerous critical pieces of information to the defense which, both individually and cumulatively, constitute the suppression of material evidence which "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, at 435.

## A. The Material Evidence That Was Suppressed in the Culpability Phase

### 1. Keenan Wilcox Testified in Exchange for a Promise of a Reward

Keenan Wilcox had known Greg Summers since childhood. He testified that Mr. Summers had previously attempted to hire him to kill his (Mr. Summers') parents. Wilcox supposedly declined and did not tell anybody about the offer until he learned that Mr. Summers' parents had been killed. Wilcox then provided information to the District Attorney and sought a reward in exchange for his testimony. *See* Record Excerpt 9, Affidavit of Helen Beardsley. In a meeting with attorneys David Marshall and Helen Beardsley, Wilcox made several admissions about obtaining a reward and being "treated right" by Taylor County law enforcement. It is critical that Mr. Summers be given an opportunity to subpoena Mr. Wilcox to an evidentiary hearing where this information can be further developed. At the time of his testimony, Mr. Wilcox was a drug addict and sold drugs. This was known to law enforcement, however Wilcox was never arrested for any of his drug activity. *See* Record Excerpt 9,

This information regarding Wilcox's drug activities and the fact that he received a reward in exchange for his testimony was never revealed to the defense.

**The Court Below**

The District Court found that while this claim had been reviewed on the merits in State court, there had been no factual finding on the issue. Consequently, the lower court reviewed the factual basis of the claim *de novo*, and evaluated the application of the law under the § 2254(d) standard. In doing so, it applied the wrong prejudice standard to the penalty phase claims.

In *Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003), Petitioner alleged that his trial counsel was ineffective because the defense investigator, SoRelle, had developed a conflicting relationship with the victim's mother. During habeas proceedings, SoRelle produced at least four conflicting affidavits concerning his conflict. *Id*. at 353. The federal district court granted summary judgment in favor of Respondent. *Id*. at 352. On appeal, this Court reversed, holding, in part, that the conflicting statements "from SoRelle **alone** produce a genuine issue of material fact. . ." *Id*. at 353 (emphasis added). Because the <u>Guy</u> court believed that "[d]irect testimony from SoRelle would better resolve questions of his credibility as well as his contradictory statements," the Court remanded the case for a full hearing. *Id*.

### 2. William Spaulding Changed His Story because he was Threatened by Law Enforcement

As demonstrated above, William Spaulding, originally subpoenaed as a defense witness, changed his story on the eve of his testimony and testified for the state that Greg Summers had supposedly admitted the crime to him. Mr. Spaulding has since provided an affidavit attesting to the fact that he changed his testimony at trial because Taylor County law enforcement officer threatened him. See Record Excerpt 8, Affidavit of William Spaulding. The State's failure to disclose the nature of Mr. Spaulding's relationship with the state was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

**The Court Below**

The District Court found that the claim as to the prosecution's threat had been denied by the State court on the merits, and consequently evaluated whether that court's denial was

"based upon an unreasonable determination of the facts in light of the evidence presented at the hearing." However, the state court had not held a hearing. The District Court then cursorily dismissed this sub-claim, again without a hearing, finding that Mr. Summers had failed to raise evidence undermining the State court's "resolution" of the conflict in testimony, which apparently consisted merely of the verbatim repetition of the prosecution's finding that no threat was made.

### 3. The State withheld evidence of William Spaulding's previous conviction for falsifying evidence.

Mr. Summers' trial was not William Spaulding's first attempt at falsifying evidence. Just four months previously, he had attempted to escape from prison by forging a Court Order giving himself 867 good time days, thereby making himself eligible for early release. (Record Excerpt 10, Prison disciplinary records of William Spaulding)

The State did not notify Mr. Summers of this obvious impeachment evidence. In fact, even today, the state is withholding this information, since the Taylor County District Attorney refused to comply with Open Records Act, Tex. Gov't Code Ann §§ 552.027. Nevertheless, this issue is exhausted because Mr. Summers' state post-conviction counsel surmised from the investigation that the District Attorney's files contained Brady material, and thus alleged that exculpatory material was contained in the file and raised this as a Brady claim.

When undersigned counsel again made a request under the Texas Open Records Act, the Taylor County District Attorney's Office again refused to comply, and requested an opinion from the Attorney General's Office. The Attorney General required the County to turn over the files. When undersigned counsel spoke with the District Attorney's Office regarding these records, she was told that they would be made available for review, but that some documents would be withheld. In a series of phone calls made to arrange review of the documents, Assistant District Attorney Dan Joiner informed Danalynn Recer that he would hold back anything he felt was not covered by the Opinion of the Attorney General and provide Ms. Recer

with a list of the items withheld so that she might challenge them if necessary. No list was ever provided, however, Mr. Joiner orally explained to Ms. Recer's law student intern, Emily Maw, who collected the records, that prior criminal histories were withheld. Thus, a hearing must be held where Mr. Summers will be able affirmatively to demonstrate that the Taylor County District Attorney's Office had actual possession of William Spaulding's prison records.

Even without such a direct demonstration, it is clear that the prosecution had constructive knowledge of Mr. Spaulding's prior record. The good faith of the prosecution is not at issue. As the district court noted,

> a finding of intentional misconduct on the part of the prosecution . . . makes no real difference under the factual circumstances of this case. Whether the conduct was deliberate or negligent, the consequences to the petitioners were the same: they were deprived of a vital opportunity to totally discredit the key and only eyewitness to the crime.

*Carter v. Rafferty*, 826 F.2d 1299, 1307 (3rd. Cir. 1987); *see also United States v. Rodriguez*, 799 F.2d 649, 654 (11th Cir. 1986) ("purpose of the rule is not to punish the Government . . . but to protect the defendant's right to a fair trial, which may be affected whether the conduct is intentional or not"). The prosecution has an affirmative obligation to assure that all branches of government disclose evidence favorable to the defense. *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

As the Fifth Circuit held in *Freeman v. Georgia*, 599 F.2d 65, 70 (5th Cir. 1979), the actions or inactions of one governmental actor must be imputed to another.

"[T]o the victim it matters not whether his constitutional right has been violated by a federal agent or a state officer."[29] Under *Brady*, the prevailing view is set forth in the *A.B.A. Standards Relating to Discovery and Procedure before Trial*:

> The prosecuting attorney's obligation . . . extends to material and information in the possession or control of members of his staff **and of any others who have**

---

[29] *Elkins v. Smith*, 364 U.S. 206, 215, 80 S. Ct. 1437, 1442-43, 4 L. Ed. 2d 1669, 1676 (1960).).

**participated in the investigation or evaluation of the case**. . . .

*Id.* § 2.6(d) (emphasis supplied).[30]

Of particular interest to this case are various precedents which explicitly hold that records of previous criminal behavior are considered constructively in the possession of the prosecution.[31]

### The Court Below

The District Court found that this claim must be reviewed *de novo*. It subsequently denied the claim, without a hearing, reasoning that because Spaulding had already admitted that he had prior convictions for forgery and issuing a worthless check, the additional information as to his conviction for falsifying legal records while incarcerated was cumulative.

### Prejudice Relating to Withholding Spaulding Impeachment Evidence

Because Spaulding was the only witness whose testimony linked Mr. Summers directly to the crime, this revelation completely alters the complexion of this case. Without Spaulding, the state had no corroboration for the testimony of alleged co-conspirators Paul Flores and Raymond Gonzales. As argued above, Spaulding's actions in questioning Mr. Summers as an agent of the State violated Mr. Summers' Fifth, Sixth and Fourteenth Amendment rights. *Massiah v. United States*, 377 U.S. 201 (1964); *United States v. Henry* 447 U.S. 264 (1980). Had the state not withheld the fact that Spaulding was coerced into testifying, the defense would have filed a Motion to Suppress and this testimony would have been excluded. Therefore, the prejudice standard regarding this evidence is whether there is a reasonable probability the defense would have had prevailed at the suppression hearing. If the Spaulding testimony was

---

30  *Accord Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975) (en banc)("evidence actually or constructively in [the state's] possession *or accessible to it*")(emphasis supplied), *cert. denied*, 425 U.S. 911 (1976); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (US Post Office and Justice Department one entity for purposes of *Brady*); *United States v. Hendricks*, 661 F.2d 38, 42 n.4 (5th Cir. 1981).).

31  *See, e.g., United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (finding constructive knowledge of FBI & NCIC records which had not been obtained by prosecutor); *United States v. Gaston*, 608 F.2d 607, 613-14 (5th Cir. 1979) (FBI 302's); *Walker v. Lockhart*, 763 F.2d 942, 948 (8th Cir. 1985), *cert. denied*, 478 U.S. 1020, 106 S. Ct. 3332, 92 L. Ed. 2d 738 (1986); *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971) (Bureau of Narcotics reports).

excluded, then there would have been no corroboration of any of the co-conspirator testimony and the state's entire case would have fallen apart. In fact, the Trial Court's Finding of Fact #4, regarding Mr. Summer's claims that Andrew Cantu's statements should not have been admitted, explicitly points to Spaulding's testimony as corroboration of the co-conspirator testimony. (Record Excerpt 7, Trial Court's Findings of Fact and Conclusions of Law).

### B. The State Withheld Evidence that Would Impeach the Testimony of its Key Penalty Phase Witness, Darrell Shirlls.

The District Court found "that Summers has established that the prosecution knowingly suppressed exculpatory evidence," and also held that the State Court applied the wrong burden of proof to the claim. After thus finding, the District Court should have ordered a hearing for factual development of the materiality prong of the Brady standard. *See* 28 USC § 2254(e)(2); *Blankenship v. Estelle*, 545 F.2d 510 (5th Cir. 1977) (evidentiary hearing required where on petitioner contended that state prosecutor failed to disclose agreement whereunder charges against witnesses would be dismissed in return for their testimony against defendant). Instead, the Court incorrectly set about to determine whether the State Court's conclusion "was reasonable in light of other evidence presented to the jury." Record Excerpt 5 at 21.

At the penalty phase of the trial, the State called Darrell Shirlls to testify about statements allegedly made by Mr. Summers regarding the anticipated testimony of a witness, Doug Jones to the effect that Jones would be killed if he failed to provide favorable testimony for Mr. Summers.[32]

At the time of his testimony, Darrell Shirlls was facing charges in relation to a six month long crime spree covering six counties. This crime spree began in January 1991 and ended upon his arrest in Denton County. Once detained, he confessed to a string of armed robberies in Denton County. He was also wanted for a dozen other felonies in other counties.[33]

---

32  S.F. XVII at 32.

33  Brazoria County, two aggravated robberies; Chambers County, two detainers for aggravated robbery Collins County, two aggravated robberies and two aggravated sexual assaults; Harris County, three

Shirlls subsequently pleaded guilty to thirteen (13) felony offenses and received concurrent sentences ranging from twenty-five (25) to thirty-two (32) years imprisonment. Further, while detained in relation to these charges, Shirlls was evaluated for mental health issues, and suffered from a history of mental illness including delusional behavior. See Record Excerpt 11.

### Materiality

Darrell Shirlls' testimony was absolutely essential to the state's penalty phase case, as he provided the only substantive evidence that Mr. Summers would pose a continuing threat to society, even if incarcerated. Without Darrell Shirlls, there was no evidence to contradict the defense case that Mr. Summers would adapt well to the structured environment of prison. The significance of this testimony is seen in the prosecutor's use of it to cross-examine Dr. Randal Price on the issue of Mr. Summers' adaptation to prison, and his use of the allegations in the hypotheticals he posed to Dr. Griffith.[34] In his closing argument, prosecutor LeBlanc used Shirlls' testimony to argue that "prison is not a place for Gregory Lynn Summers."[35]

This argument terrified the jurors, and was specifically cited by Delta Sue Baty as the reason she felt that it would be dishonest to answer the special issues "no" although she wished to return a life verdict:

> For me, the most influential testimony at the penalty phase of the trial was the combination of the testimony of the psychologist or psychiatrist, Dr. Grigson and the little boy from the prison who made threats to him.

Record Excerpt 12 Affidavit of Delta Sue Baty.

Shirlls' list of pending charges was obviously relevant to his credibility, both because the

---

aggravated robberies, aggravated sexual assault and attempted capital murder; Tarrant County aggravated robbery.

34 S.F. XVII, pp. 220-223, 235.

35 Ladies and Gentlemen, you heard Darrell Shirll say that the defendant threatened to hire somebody to kill Doug Jones if he did not testify for him, uh, the way that the Defendant wanted him to testify. This took place, Ladies and Gentlemen, just recently in the Denton County Jail, while he was being tried for these two cases that you're hearing now. S.F. XVII at 256.

charges included numerous acts of deceit and dishonesty and because the sheer volume of the pending charges demonstrates the enormous pressure under which Shirlls testified and his desperation to please the prosecution. This crucial impeachment evidence should have been disclosed to the defense.[36] The fundamental nature of the error, hindering the jury from making the proper determination as to the credibility of such a crucial witness, warrants resentencing.[37]

Without the impeachment evidence, the defense lawyers and jurors were left with the false impression that Darrell Shirlls was truthful witness with no apparent grudges to bear and no deals to seek. In the context of this case, Darrell Shirlls' testimony is sufficiently material to the question of whether or not Mr. Summers' posed a future danger that, in its absence, the jury's affirmative response to the second special issue is unconstitutionally unreliable. Had prosecutors revealed Darrell Shirlls' pending charges there is a "reasonable probability" that at least one juror would have returned negative answers to the Texas special issues, and Mr. Summers would have received a life sentence.[38]

As a result, the jury that sentenced Mr. Summers to death was denied important information about the credibility and motivations of a critical state witness.[39] The State's failure

---

36 *See United States v. Alexius*, 76 F.3d 642, (5th Cir. 1996) (finding error where defendant was not permitted to cross-examine a witness regarding pending charges); *United States v. Brown*, 546 F.2d 166, 169–70 (5th Cir. 1977) (holding that "[a]n accused is entitled to show by cross-examination that the testimony of a witness may be affected by fear or favor growing out of the disposition of pending criminal matters," and noting that the materiality of this evidence is necessarily magnified when the witness being subjected to cross-examination is the governments 'star witness'); *Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968),), *cert. denied*, 394 U.S. 966 (evidence of a pending indictment admissible to show bias, prejudice and motive); Rule 607, Rule 610 (b), Texas Rules of Criminal Evidence.
37 *See United States v. Landerman*, 109 F.3d 1053, 1062, 1065 (5th Cir. 1997) (vacating conviction of defendants in case where district court should have allowed the jury to "draw its own inferences regarding [the witness's] credibility and determine what effect, if any, the pending criminal charge had on [the witness's] motivation to testify.").
38 *United States* v. *Bagley*, 473 U.S. 667 (1985); *United States v.*); *United States v. Agurs*, 427 U.S. 97 (1976);); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419 (1995),), *Brady*, 373 U.S. 83 (1963).
39 *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) ("the destruction by cross-examination of the credibility of one of two crucial witnesses-even if the other remains untouched-may have consequences for the case extending far beyond the discrediting of [the one witness]").

to disclose the information regarding Mr. Shirlls' pending charges requires that Mr. Summers' sentence be vacated.

**The Court Below**

The District Court properly found numerous *Brady* violations in Mr. Summers' case. However, the prejudice analysis applied was not consistent with established Supreme Court precedent. First, even where individual error may be insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* or *Strickland* error can suffice to warrant habeas relief. *See e.g. Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (finding unreasonable application of *Strickland* where court failed to examine effect of errors cumulatively).

Moreover, the *Strickland/Brady* materiality standard "is not a sufficiency of the evidence test." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). If "there is a reasonable probability that at least one juror would have struck a different balance," prejudice has been established. *Wiggins v. Smith*, 123 S.Ct. 2527, 2543. In assessing prejudice in Mr. Summers' case, therefore, the question is not whether this Court can "correct" the State's *Brady* errors and then determine whether Mr. Summers can still be found guilty. The touchstone is whether his actual trial and verdict, in light of the State's *Brady* violations still can be worthy of confidence. See *East v. Johnson*, 123 F.3d 235 (5th Cir. 1997) (vacating sentence where state suppressed evidence that, of nineteen punishment-phase witnesses , one, who testified that the Defendant brutally raped her and admitted to committing prior murders, had a history of bizarre sexual hallucinations and mental illness).[40]

A cumulative examination of the *Brady* evidence in Mr. Summers' case compels a similar conclusion as that in *East*.[41] In contrast with the somewhat isolated *Brady* violation in *East*, the violations in Mr. Summers' case are pervasive. The District Court concluded that the State

---

40 Notably, East was prosecuted by the same District Attorney's Office that prosecuted Mr. Summers.
41 At a minimum, the cumulative impact of the State's *Brady* violations warrants a denial of summary judgment and should compel further development of this issue.

failed to disclose numerous violations:

    1. a disciplinary violation of William Spaulding where he attempted to escape from prison by forging a court order so that he would be eligible for early release.

    2. evidence that Daryl Shirlls was under indictment on more than a dozen felony charges in six counties, including rape and attempted capital murder[42]

    3. false testimony of Dr. Grigson regarding Mr. Summers' future dangerousness

    Moreover, the *Brady / Giglio* evidence relating to the State's punishment phase witnesses undermines state witnesses who presented critical evidence. The District Court conducted a separate analysis of each violation and compared it to "four types of evidence" introduced at punishment: 1) the case itself, 2) alleged domestic violence, 3) psychiatric testimony, and 4) Shirlls' testimony. Order at 25. What the District Court overlooked, however, was the qualitative nature of the evidence rather than simply the quantity itself. The jury could have inferred from the facts of the conviction and the allegations of domestic violence that Mr. Summers was involved in discordant family relations. In stark contrast, the testimony of Shirlls told the jury that Mr. Summers was incapable of conforming to any societal norms even outside of family and romantic relationships. Shirlls' suspect testimony led the jury to believe, falsely, that Mr. Summers was willing to arrange for the death of witnesses who would testify against him. The significance of this testimony cannot be overstated nor was it lost on the prosecutor who dedicated a substantial portion of closing argument to it.[43]

---

42 Only one indictment was revealed.

43 "Prison is not a place for Gregory Lynn Summers. Ladies and Gentleman, you heard Darrell Schrell [sic] say that the Defendant threatened to hire somebody to kill Doug Jones if he did not testify for him, uh, the way that the Defendant wanted him to testify." S.F. XVII at 256.
"Where's the evidence of change in Greg Summers? There's not any. In fact, while this trial has been going on, over there at the Denton County Jail, when Doug Jones decided to come into this courtroom and tell the truth, Greg Summers didn't change, but reverted to the same old thing that he did before. "I'll get somebody to kill him." Ladies and Gentlemen, there's no change. There's been no change at all." S.F. XVIII at 271.
"Ladies and Gentlemen, we don't want to pick up a newspaper sometime in the future and read about the — the prison murder of Doug Jones. And that's not — Ladies and Gentlemen, that's not just speculation. We have the evidence before us to consider that. . Prison is a violent place, filled with violent individuals exactly like the

Finally, in applying what appears to be similar to a sufficiency standard not condoned in *Kyles* the District Court improperly assessed the cumulative impact of the suppressed evidence. Pursuant to Supreme Court law, if "there is a reasonable probability that at least **one** juror would have struck a different balance," prejudice has been established. *Wiggins v. Smith*, 123 S.Ct. 2527, 2543 (emphasis added). Mr. Summers has clearly met this standard. In the end, however, no speculation about the effect of this evidence is even necessary in Mr. Summers' case. At least one of the very jurors who sat on Mr. Summers' case specifically cited Grigson and Shirlls as the reason she felt that it would be dishonest to answer the special issues "no" although she wished to return a life verdict:

> For me, the most influential testimony at the penalty phase of the trial was the combination of the testimony of the psychologist or psychiatrist, Dr. Grigson and the little boy from the prison who made threats to him.

*Amended Petition at* Record Excerpt 12, Affidavit of Delta Sue Baty. Given that the jurors were given a misleading and constitutionally inform instruction that denied them any opportunity to give effect to Mr. Summers mitigating evidence, the harm of this aggravating evidence was magnified.

### III. THE JURORS WHO SENTENCED MR. SUMMERS TO DIE WERE GIVEN CONSTITUTIONALLY DEFECTIVE INSTRUCTIONS SO CONFUSING AND MISLEADING THAT THEY WERE PREVENTED FROM GIVING EFFECT TO MITIGATING EVIDENCE AND GIVEN NO CHOICE BUT TO VOTE FOR DEATH

Throughout the era of the modern death penalty, the United States Supreme Court has insisted that the ultimate punishment must not be meted out in an "arbitrary and capricious manner." Rather, there must be a "meaningful basis for distinguishing the cases in which it is

---

Defendant in this case. Guards can't look everywhere. They can't be everywhere all the time. Sometimes their backs are turned. And people die, people are murdered in the penitentiary. Ladies and Gentlemen, Greg Summers has not changed. Greg Summers has planned and has already threatened to have someone else killed while he's been incarcerated, while he's been locked up." S.F. XVIII at 273-74.

imposed from the many in which it is not." [44]

To insure that the ultimate penalty is not meted out arbitrarily, the Court has established a series of principles to guide courts in instructing the jury at sentencing--that terms must be clearly defined[45], that jurors must be required to consider mitigation[46], that jurors should be instructed as to the consequences of their verdict[47], and that no instruction can be given to undermine the jury's sense of responsibility for the imposition of a death sentence.[48]

The trial court in Mr. Summers' case violated these clearly established Supreme Court principles in every regard. In the Court below, Mr. Summers presented five subsections to this claim. He does not abandon any of those issues, but, in compliance with this Court's space limitations, will fully brief only the *Penry/Tennard/Smith* claim and incorporates here by reference his arguments supporting his other four claims, that Texas' statute violates *Mills v. Maryland, Simmons v. South Carolina, and Caldwell v. Mississippi* and otherwise fails to provide the constitutionally mandated reliability in capital sentencing.

### A. The Trial Court Failed to Instruct the Jury that it was Required to Consider Mitigating Evidence in Determining the Appropriate Punishment in Violation of Mr. Summers' Rights Under the Sixth, Eighth and Fourteenth Amendments.

The process of guiding the discretion of the jury requires that the sentencer "not be precluded from considering, **as a mitigating factor**, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a

---

44 *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)), *Chenault v. Stynchcombe*, 581 F.2d 444, 448 (5th Cir. 1978).

45 *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). *See also Profitt v. Florida*, 428 U.S. 242, 253 (1976).

46 *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Penry v. Lynaugh*, 492 U.S. 302 (1989),

47 *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994); *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 1267, 1272, 149 L.Ed.2d 178 (2001).

48 *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

sentence less than death."[49]  Indeed, the jury must be "specifically instructed to consider, as mitigating evidence" evidence of the defendant's background, character, and crime.[50]

The Texas capital sentencing statute and its application has been reviewed eight times[51] by the United States Supreme Court to insure that it permits such individualized sentencing.  In *Jurek v. Texas*, 428 U.S. 262 (1976), the court relied upon the notion that the special issues would "`guide and focus the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender.'"  *Spivey*, 661 F.2d at 471, (*quoting Jurek v. Texas*, 428 U.S. 262, 274 (1976)).

Ten years later, however, the court again considered the Texas statute and found that the special questions gave juries no mechanism whereby they might give effect to mitigating circumstances offered by the defense.  *Penry v. Lynaugh*, 492 U.S. 302 (1989).  The court struck down the Texas statute, explaining that the individualized sentencing required by *Lockett* and *Eddings* must "reflect a reasoned moral response to the defendant's background, character and crime."  *Id.* at 308-309, 322-326.  Because the two special issues did not allow jurors to consider any mitigation other than that relevant to deliberateness and future dangerousness, the Texas statute failed to allow such consideration of the defendant's individual characteristics.  In response to *Penry I*, the state legislature reworked the Texas statute to include a special issue on mitigation.[52]

This statute went into effect on September 1, 1991, just eight days after Mr. Summers

---

49  *Woodson v. South Carolina*, 428 U.S. 280, 304 (1976), *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (19782d 973 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).

50   *Blystone v. Pennsylvania*, 494 U.S.299 (1990),

51  *Jurek, supra*, *Penry v. Lynaugh*, 492 U.S. 302 (1989), *Adams v. Texas*, 448 U.S. 38, 46 (1980), *Graham v. Collins*, 113 S.Ct. 892 (1993);); *Johnson v. Texas*, 119 S. Ct. 2658, 2670 (1993); *Penry v. Johnson*, 121 S.Ct. 1910 (2001); *Penry v. Johnson*, 121 S.Ct. 1910 (2001); *Tennard v. Dretke*, 124 S.Ct. 2562 (2004) ; *Smith v. Texas*, 125 S.Ct. 400 (2004).

52   Juries are now asked "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."  Art. 37071(2)(e)(3)(d), V.A.C.C.P.

was sentenced to die, although it was passed months beforehand, and thus its contents were known. However, in the time between *Penry I* and the effective date of the new statute, Texas trial courts cobbled together various home remedies for what had come to be known as the "Penry problem." One of these, used in the resentencing of Penry himself, was to offer a supplemental instruction effectively inviting the jurors to answer one of the special issues dishonestly if they wanted to vote for a life sentence. This solution has recently been firmly rejected by the United States Supreme Court.[53] Apparently, it is this same home remedy that Judge Solis attempted to use in Mr. Summers' penalty phase. However, the instruction given to Mr. Summers' jury is even more infirm than that used in Mr. Penry's resentencing or Mr. Smith's trial.

### The Instructions Given in This Case

Judge Solis did not give Mr. Summers' jurors a supplemental instruction, but rather, gave them the same two special issues that had already been found constitutionally infirm and attempted to patch them up only with one single, vague reference to mitigating evidence:

> Further, you may consider in answering the Special Issues, facts and circumstances, if any, presented in evidence in aggravation, extenuation or mitigation thereof.

(Tr. 156). It is unclear what Judge Solis meant by this, as he provided no jury form for any question or finding regarding mitigation and did not invite jury nullification in his remarks. In *voir dire*, the venire had been questioned about their willingness to essentially provide false answers to the special issues, though the court never actually told the jurors that they should answer one of the questions "no" if they found mitigating circumstances in favor of a life sentence. The trial court's charge to the jury did not define mitigating circumstances or even attempt to explain to the jury that it was constitutionally required to consider mitigating evidence in reaching its verdict or how to consider the evidence as mitigating.

---

[53] *Penry v. Johnson,* 121 S.Ct. 1910 (2001) (hereinafter *Penry II*); *Smith v. Texas,* 125 S.Ct. 400 (2004).

The *voir dire* of the seated jurors in this case portrays the tragic confusion of not only the jurors, but the attorneys and trial court as well.[54] Clearly no one in the room understood what was being asked of these twelve jurors. And, if any of them did, for even a moment, understand their task to be the one set for them by Justice O'Connor, they would have been thoroughly disabused of the notion by the subsequent comments of the prosecution and the court. In his closing argument, Assistant District Attorney Sutton specifically instructed the jury that to vote "no" in such a circumstance would be a violation of their oath.

Interviews with the jurors who condemned Mr. Summers verify that they never understood the instructions, and, most importantly, never thought they had a choice in sentencing him to die. Record Excerpt 12, Affidavit of Delta Sue Baty.

**Mr. Summers' Mitigating Evidence**

At the penalty phase, Mr. Summers presented considerable evidence in mitigation of his sentence. The trial court's Findings of Fact and Conclusions of Law note that he presented evidence of good character and good conduct. This is true. Six friends testified to his non-violent nature and to the fact that he held down a full time job and supported his girlfriend and her children. He also presented evidence of his Christian faith. Ewing Nelson, the Chaplain for Taylor County testified that Mr. Summers came to him for counseling up to three times a week while incarcerated in Taylor County, and expressed sincere grief over the deaths of his parents. Finally, Dr. Randal Price testified that Mr. Summers' would successfully adapt to prison life.[55]

All of this evidence should have been considered by the jury in mitigation of Mr. Summers' sentence. However, the instructions and special issues provided the jury with no means to give effect to this evidence. Juror Delta Sue Baty vividly remembers that she wanted to give Mr. Summers a life sentence and that she held out against the majority of her fellow

---

54 See Mr. Summers' Original Petition, and *voir dire* excerpts provided there. S.F. V at 212-214; S.F. VII at 721; S.F. VII at 744-747; S.F. V at 260-261; S.F. V at 290; S.F. Vol. VII 775-776; S.F. VII at 792-798; S.F. VII at 937-938; S.F. VII at 949-950.
55 S.F. XVII at 203-205; S.F. XVII at 215.

jurors, but finally gave in because she felt there was no alternative, *See* Record Excerpt 12, Affidavit of Delta Sue Baty.

**The Court Below**

The District Court first holds that it must review Mr. Summers' *Penry* claim *de novo* because the State Court "based its denial on the premise that evidence of good character was not mitigating evidence," and "this premise is incorrect." However, the court nevertheless denied the claim, relying on *Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999) for the proposition that the Texas sentencing questions did not foreclose the jury's giving effect to positive aspects of Mr. Summers' background and character. *Boyd* is one in a long line of cases which was squarely rejected by the Supreme Court in *Penry II,* issued before the District Court released its decision, and, most recently, in *Smith v. Texas,* 125 S.Ct. 400 (2004). A hearing should be held on this issue, or sentencing relief should be granted.

**CONCLUSION AND PRAYER FOR RELIEF**

WHEREFORE, Mr. Summers prays that this Court will issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death.

In the alternative, Mr. Summers prays that this Court will remand his cause back to the District Court of the Eastern District of Texas for evidentiary development; order that he be granted discovery, expert and investigative assistance, and an evidentiary hearing at which he may present evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing; and grant such other relief as may be necessary and appropriate.

Respectfully submitted,

_____

**Danalynn Recer**

Texas Bar No. 00752935
809 Henderson
Houston, Texas 77007
(713)869-4722
Fax (713)880-3811

**Clive Stafford Smith**
Louisiana Bar No. 14444
636 Baronne St.
New Orleans, La.  70113
(504) 558-9867
Fax: (504) 558-0378

Counsel for Mr. Summers

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of December 2004, a true and correct copy of the foregoing pleading was served upon Counsel for Respondent, by United States Mail, first class, postage prepaid, addressed to:

Carrie Parsons
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548

_____
Danalynn Recer, Counsel for Mr. Summers